ROBERT E. LEE ET AL., PETITIONERS, v. JOHN A. LAITINEN
ET AL., RESPONDENTS.

No. 11453.

Submitted November 19, 1968. Decided December 11, 1968.

448 P.2d 154.

Jones, Olsen, Christensen & Herndon, Donald R. Herndon, (argued), Billings, for petitioners.

John L. Adams, Jr. (argued), Billings, Thomas H. Mahan, (argued), Helena, for respondents.

MR. CHIEF JUSTICE JAMES T. HARRISON delivered the Opinion of the Court.

This is an appeal from an order dismissing an alternative writ of mandate issued by the district court of Yellowstone County.

Petitioners are connected with various nursing homes, and in their capacity as such, applied for an alternative writ of mandate to be directed to the respondent welfare officials,

which would require the State Board of Public Welfare to rescind its order setting compensation to skilled nursing homes at the flat rate of $9.04 per day per patient and to pay instead the reasonable cost, pursuant to Chapter 325, Laws of 1967, of such care provided to individual patients; to require payment to skilled nursing homes such reasonable cost retroactive to July 1, 1967.

Following the issuance of an alternative writ of mandate the district court held a hearing. Petitioners took the position that Chapter 325, Laws of 1967, imposed a duty on the State Board of Public Welfare to pay the full reasonable cost of the respective vendors for any services rendered thereunder. Respondents' position was that such compensation is a matter of discretion within the limits set by the objective established by the federal and state statutes; that the discretionary act was performed in good faith and that mandamus does not lie to control discretion.

Following the hearing the court entered an order dismissing the alternative writ. Judge Charles Luedke also filed a memorandum in support of his order, and he sets forth the situation prevalent here so clearly that we quote a considerable portion of it:

"By this lawsuit, Petitioners request the Court to direct Respondents to pay them their usual and customary nursing home charges, which they assert to be reasonable free from the maximum limitation of $9.94 per day fixed by Respondents. This being a mandamus action, the question is whether the applicable law imposes a clear legal duty upon Respondents to comply with Petitioners' request.

"In 1965, the United States Congress enacted the present Title 19 to the Federal Social Security Act and it was approved July 30, 1965. [Public Law 89-97, Title I, Sec. 121 (a), 79 Stat. 343, 43 [42] USCA 1396, also known as 'Medicaid' and amounting to a liberalizing amendment of the former Kerr-Mills program.] It provides federal funds to the states for

the furnishing of medical assistance to qualifying families and persons. By the enactment of Chapter 325, Session Laws of 1967 (Sections 71-1511 through 71-1526, R.C.M.1947) the Montana Legislature provided the necessary enabling legislation for participation. The provisions of such Montana Act, however, amount only to the bare bones, with directions that the program be administered and supervised by the State Department of Public Welfare as contemplated by the provisions of Title 19 of the federal act. Such federal act contemplates, among other things, that a participating state must furnish a detailed state plan of medical assistance on terms agreeable to federal authority under the federal act as a prerequisite to entitlement of federal funds. Such a plan was submitted by the State Department of Public Welfare, and approved by the federal Department of Health, Education and Welfare. Included in such plan is the State's agreement to administer the plan in accordance with the policies and interpretations contained in the Federal Handbook, Supplement D—Medical Assistance Program.

"Therefore, to ascertain the duties imposed by law upon the welfare department, reference must be made to the federal and state acts, to the state plan and to the Federal Handbook, Supplement D, insofar as they concern the rate of compensation to be paid to nursing homes as providers of services.

"Neither the federal law nor the state law contain any provisions specifying the rate of payment . [Title 18 of the Federal Social Security Act requires payment of reasonable costs of inpatient hospital services. There is no such provision in Title 19 applicable to skilled nursing home services.]

"The state plan specifies only that fee structures will be established so as to enlist participation of enough providers that recipients under the program will receive care and services at least to the extent available to the general population, and that the fee established will constitute payment in full. This conforms to the requirements contained in the Federal

Handbook, Supplement D, (D-5320), but such federal require-ments seem to contemplate that the fee structure shall focus on payment on a reasonable cost basis, determined according to commonly used accounting methods (D-5144 and D-5340). However, no formula for 'reasonable cost' is furnished for the Title 19 program.

"From the foregoing it is apparent that the clear legal duty imposed upon the Welfare Board is not in terms of a specific rate of payment, but in the form of an objective to be attained; namely, to make nursing home care available to recipients to at least the same extent as to the general population. Petition-ers arrive at the same concept of the duty imposed, but on the basis of federal law requirements as to standards of service. Whether phrased in terms of quality or quantity, the duty imposed is the same, to make available to Title 19 recipients at least that which is available to others.

"The circumstance which gives rise to this suit is that the welfare department, pending completion of a cost survey to determine a reasonable cost basis, fixed an interim maximum per-day rate of $9.04 (since increased to $9.94). (From the inception the Welfare Department intended that rate of pay-ment for each facility would be established on 'reasonable costs' as soon as a cost survey could be completed of *all* fa-cilities and a uniform method of cost determination be found. (Pet.Ex.D) Such cost study was actually implemented No-vember 6, 1967 (Res.Ex. #2) and is currently in process, scheduled to be completed by July 1, 1968, or sooner if possible.] This payment must be accepted as full payment by the nursing homes without supplementation from any other source. Petitioners have found this rate inadequate and ask that the Welfare Board be required to abandon its maxi-mum limitation and pay the amount usually and customarily billed to the patient. The evidence shows that the Welfare Board settled upon the policy of using a maximum rate, and arrived at the maximum-rate figure of $9.04 (subject to a

10% increase for justifiable need shown) after consideration of past experience under the former Kerr-Mills program and review of what was being done or planned in other states. [Utah and North Dakota were considered appropriate guideposts. Wyoming and Idaho were considered but not relied upon because of variances from Montana circumstances.] Commitment to some such definite policy, even before passage of the state enabling law, is asserted as necessary in order to establish a budget for fixing the amount of the appropriation request from the legislature. Subsequently this policy was approved by the Advisory Council established under state law (71-1513, R.C.M.1947) and was reaffirmed by the Welfare Board as against objections thereto made on behalf of the nursing homes through their association.

"In essence the Welfare Board is contending that because of money limitations, arising from the amount of appropriation having been based upon the maximum-rate policy, until a state-wide cost survey could be completed, no change can be made except in conformity with such plan. Petitioners counter that if any lack of funds exist, it is not a proper defense as to rate of payment where the Welfare Board has the power under state law to adjust the priorities and amount of services offered when funds become inadequate (71-1512(i) R.C.M.1947). Consequently, Petitioners find the Welfare Board to be acting arbitrarily in refusing to extend to nursing homes the same offer made to hospitals to pay the full customary billing, subject to a refund to the State if a reasonable cost rate is later found to be less. (Pet.Exh. 'E') [The Welfare Board counters that the situation as to hospitals is not analogous to nursing homes because the former also come under Title 18 while the latter are covered by Title 19. The evidence submitted does not make the full significance of this difference clear.] The evidence shows that the Welfare Board has considered a proposal in this form and decided against it as to nursing homes.

"Petitioners' contentions seem to have two main thrusts. First, that with the duty of the Welfare Board being to make services available to an extent not less than those available to the unaided public, a necessary implication arises that the same rate of pay must be paid as is charged the general public. In short, that where the services must be full the pay be full, for if the pay is less the services will be less. Second, that the Welfare Board is not authorized to allow financial considerations to control the rate of pay but only to control the priority and amount of assistance given.

"As to the first argument, the answer lies in looking at results, not methods. Does the rate fixed enlist sufficient services of a proper standard to be comparable to those available to the general population? This in turn queries as to what is available to the general population. It cannot be said that the average member of the public enjoys completely unlimited availability. He is subject to problems of finance, geography and other factors. This is recognized by the federal law requirement on standards and the state plan requirement on fee structures. These provisions are phrased in terms of availability of services 'at least to the extent' and 'not be less in amount,' etc., [State Plan IV, C, 1. page 7; 42 USCA 1936a [1396a] (10) [A] (ii)] which language acknowledges that the availability to the public is something less than perfect, for the program can provide more but not less than the public receives. In the eyes of the federal agency, comparable availability seems to be satisfied through the participation of not less than two-thirds of the providers (D-5330-a). Uncontradicted testimony at the hearing was to the effect that the present rate covers the customary billing charges of about 80% of the nursing home facilities. Petitioners belong among the remaining 20% but this had not prevented their participation in the program. The total result, then, is that participation has been in excess of 80%, although not all providers have been satisfied financially and may discontinue to be

available in the future. [On July 15, 1967, 17 nursing homes signed a statement of policy that all patients would receive billing at the full, customary and usual charges and if not paid by the welfare department by August 10, 1967, the patients would be discharged. There is no evidence that this ultimatum has actually been carried out. (See Res.Exh. #1) There is no obligation imposed upon nursing homes to participate. They may refuse to accept the offered recipients. Likewise, the recipient patient has complete freedom of choice among facilities.] The cost survey currently in process is intended to overcome this imperfection.

"Measured, as it must be, in terms of results, it cannot be said that the present policy of the Welfare Board is in violation of the duty imposed upon it. Whether another policy might be as good, or even better, is not for the Court to say, for that is within the discretionary powers of the Welfare Board to determine.

"Petitioners' second contention must also be judged in light of the duty imposed upon the Welfare Board: the standard of availability. Accepting Petitioners' premise that financial considerations cannot control rate of pay but only priorities and amounts of assistance, the result can be that when the money is exhausted the program will stop either in whole or in part. As to any part of the program stopped or reduced, the required availability standard is not being fulfilled. The question then is a matter of judgment as to whether the better course is to follow a plan which enlists not less than 80% participation for the entire period, or one which accomplishes 100% availability for part of the period and either no program or a reduced program in some or all areas of services for the balance. The question before the Court is not which approach is the better one, for that judgment is exclusively within the province of the Welfare Board. The Court can only require the Board to act, and since it has acted, differences of opinion might lie, but mandamus does not."

It is thus seen that the evidence before the court established that the Board did perform its duty by fixing the rate in good faith. Such being the case mandamus does not lie since it cannot be used to control discretion. Skaggs Drug Centers v. Mont. Liquor Control, 146 Mont. 115, 404 P.2d 511.

Petitioners insist, however, that even where discretion is involved, as was held in State ex rel. Marshall v. District Court, 50 Mont. 289, 146 P. 743, and State ex rel. Westercamp v. State Board of Chir. Ex., 137 Mont. 451, 352 P.2d 995, if there has been an abuse so as to amount to no exercise of discretion at all, mandamus will lie to compel the proper exercise of the powers granted. In this cause the proof shows an exercise of discretion by the Board, as pointed out by the district judge, and the rule contended for by petitioners is not applicable.

The ruling of the district court was correct and the order appealed from is affirmed.

MR. JUSTICES HASWELL, ADAIR, CASTLES and JOHN CONWAY HARRISON, concur.